We'll hear argument first this morning in Case 10-9646, Miller v. Alabama. Mr. Stevenson. Mr. Chief Justice, and may it please the Court, in Graham v. Florida, this Court recognized that children are inherently characterized by internal attributes and external circumstances that preclude a finding of a degree of culpability that would make a sentence of life imprisonment without the possibility of parole constitutionally permissible under the Court's Eighth Amendment excessiveness analysis. While the issue in Graham involved juveniles that were convicted of non-homicide offenses, these deficits in maturity and judgment and decision-making are not crime specific. All children are encumbered with the same barriers that this Court has found to be constitutionally relevant before imposition of a sentence of life imprisonment without parole or the death penalty. In fact, in Roper, this Court acknowledged that these differences between children and adults exist even in the cases involving the most aggravated murders. These deficits, these differences are even more pronounced in young children. Mr. Stevenson, but in Roper, the Court also made the point when it ruled out the death penalty, it said, to the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction. So the Court in Roper seemed to be anticipating this case and suggesting that it was all right, it was constitutional. There's no question, Justice Ginsburg, that the default sentence in Roper was life imprisonment without parole. But we actually think that specifically with regard to that provision, there is no greater deterrent effect in these deficits, that these problems that children experience lend themselves to an analysis that is subject when the punishment is life imprisonment without parole, like the death penalty. What about 50 years? Is that too much? What the Court held in Graham was the same. Scalia, I mean, you know, once you depart from the principle that we've enunciated that death is different, why is life without parole categorically different from 60 years or 70 years or, you know, you'll be back here next term with a 60-year sentence? Justice Scalia, I think you're absolutely right that there is a point at which a term of your sentence could constitute the same kind of judgment as life imprisonment without parole. But there is a distinction, obviously, between life imprisonment without parole and any other term sentence. Those sentences, in most instances, if the sentence is not too extreme, do permit the possibility of release. And what this Court held in Graham is not that the State forfeits the ability to incarcerate for life. Scalia, I'll change my question to 50 years without possibility of parole. Then you have no distinction, right? Well, I think there it would be a tough case. I think imposing a juvenile, a 50-year sentence, would not create the meaningful possibility of release that this Court ordered in the Graham context. It would be right on the line, but I think 50 years would actually be on the other side of a meaningful possibility of release. It would be sort of a cynical reaction if this Court were to say we ban life without parole for these kinds of offenders. It would be somewhat problematic to suggest that we're going to get as close to death as possible and then facilitate some kind of review. I think what we're interested in is that. Scalia, about 15 years old, 15, 60 years, or 14, 70 years? I think all of those. What's the distinction between 14 and 15? Well, I think from a sentencing perspective, all of those sentences would be problematic. But the distinction between a 14-year-old and a 15-year-old for constitutional purposes is that, of course, the younger you are, the more compelling are these deficits, these distinctions that. I understand, but how are we to know where to draw those lines? We can't do it on the basis of any historical tradition, certainly. Well, I think that. The common law left it up to the jury to take account of the youthfulness of the offender. Well, I think. They're all entitled to jury trial, right, before their. Well, that's true, but of course, in this case, Justice Scalia, and in the other case, there was no discretion for the sentencer. Neither the judge nor the jury could give any effect to the age of Evan Miller, who was 14. But I also think that we've identified lots of laws that make these distinctions. We do provide for greater responsibilities. Ginsburg. Would that satisfy you if the – if it were not a mandatory term and it was left to the trier, and you could put in all the mitigating circumstances? That would not satisfy me, Justice Ginsburg, for all the reasons that this Court acknowledged in Graham. That the problem with many of these crimes is that the offense itself can overwhelm all of these mitigating factors, all of these aspects of juvenile decision-making that we think are constitutionally permissible. The other problem is that we still can't make good judgments about whether a child – whether these characteristics are transitory or permanent. So you're saying it would be unprincipled for us to say, or at least unsupported, for us to say that the sentence cannot be mandatory, but that in some cases it might still be imposed? I think it would be principled to kind of strike down mandatory sentences. But I think constitutionally what this Court has recognized in Roper and in Graham, that it would be a mistake to equate kids with adults. And we don't have the ability to make those judgments, even if we create a different kind of process. Kennedy, if you take that off the table, then you leave us with nothing but saying that the sentence is never permitted or that it's always permitted. Well, I don't mean to take it off the table. I just mean to argue, as we did previously, that a categorical ban would be consistent with the Court's understanding about child status and development. If you could write the opinion for us, what would you hold? I would hold that children are categorically prohibited from being subjected to sentences. What's the definition of a child for that purpose? Well, we presented data in this case that would exclude youth 14 and younger. No State that has set a minimum age for life without parole has set it beneath the age of 15 other than 1. And so we would make that holding. I do think it would be a prohibition. So you would hold you can't – there cannot be a sentence of life imprisonment without parole for anyone under 15, but for anybody over 15 it would be permissible? No. I would also hold, Your Honor, that a mandatory sentence for that cohort would also be in violation of this Eighth Amendment. Well, you could say we reserve that question for another day. Well, I think that the problem, Justice Ginsburg, is that these cases with the mandatory sentencing aspects to them create kind of a data issue that this Court has usually relied on to kind of generate an interest. I think right now we know that excluding considerations of age and character in a sentencing determination of life imprisonment without parole is problematic. Well, can you tell us where the age line needs to be drawn for constitutional purposes? I would draw it at 18, Justice Alito, because we've done that previously. We've done that consistently. That's where you think the logic of your argument leads. That's exactly right. And you would say that a 17, a person of 17 years and 10 months, 11 months, who commits the worst possible string of offenses, still and demonstrates great maturity, still cannot be sentenced to life imprisonment without parole. That's right, for the same reasons that we made that determination in Graham and that the Court made that determination in Roper. And I understand that there are some tensions when we draw those kinds of things. Sotomayor, I'm sorry, I thought you just said a second earlier that you had a bifurcated rule, no life without parole whatsoever for 15 and under, and no mandatory life for 16, 15 and over. That would be — I'd have two rules, Justice Sotomayor. My preferred rule would be a categorical ban on all juveniles under the age of 18, and I don't want to retreat from that in any way. All of these deficits, all of these characteristics that we're talking about have been recognized to apply to all youth up until the age of 18. Sotomayor, how do you write the opinion to do the bifurcated rule? What justifies an absolute ban at a certain age and a modified ban above an age? And how do you deal with Harmland with respect to the second part of your rule? Yeah. Harmland says we don't look at individualized sentencing. Yeah. So how do we get rid of the mandatory if that's what we were going to do? It's a challenge, and I concede that. But I — and so the first part of my answer would be that I think the easier rule to write would be that there is a categorical ban on all life without parole sentences for all children up until the age of 18. How do I come to that decision? What, do I just consult my own preferences on this matter? Something like 39 States allow it. I mean, the American people, you know, have decided that that's the rule. They allow it. And the Federal Government allows it. So I'm supposed to impose my judgment on what seems to be a consensus of the American people? Well, at least in this case, you look to your precedent in Roper and in Graham, which drew that line. Well, that's not going to help me, you know. Well, I understand. I understand, Justice Scalia. But I don't think you can draw much comfort in the fact that 39 jurisdictions make this theoretically possible. That same number existed in the Graham context. Most of those jurisdictions have not addressed a minimum age for life without parole. In fact — What do you mean when you say that, that they have not addressed it? If the State law allows it, have they not addressed it? Yes. That is, what the State permits is that children — You mean that the legislators don't understand that their law permits this? I don't think we can read into a transfer judgment, which is the only judgment that they've made. They've said that some children of some age can be treated like adults. They haven't talked about what the punishment should be. And the reason why I say that, Justice Alito, is that in many of these States, there's no minimum age for trying a child as an adult. But I don't really understand this argument. You mean the legislatures have enacted these laws, but they don't realize that under these laws, a person under the age of 18 may be sentenced to life imprisonment without parole for murder? They don't understand that. They have not considered that or adopted or endorsed it. That's difficult, because the statistics show there are 2,300 prisoners now under sentence of life without parole for juvenile murders, and there are — that were committed under 18, 2,300 nationwide. That's correct. So it's very difficult to assess your answer to Justice Alito that, oh, the legislatures don't know about this. Well, that answer, Your Honor — that number, Your Honor, is partly rooted in the fact that these sentences are mandatory. There is no one capable, once the Court makes a decision to try the child as an adult, to do anything to consider the status of children. If you think these legislators don't understand what their laws provide, why don't you contact them? And when they — when you tell them, do you realize that in your State, a 16-year-old or a 17-year-old may be sentenced to life imprisonment without parole for murder, they'll say, oh, my gosh, I never realized that. Let's change the law. Well, I mean, I don't think there are any legislatures that are quick to make their sentences less — more compassionate, more responsive to juvenile crime of any sort. So they've made a decision on this. Now, maybe it's a bad decision, but I really don't understand how you can argue that they have not made a decision on this, that they are not aware of what their law provides. I think the strength of my argument, Justice Alito, is that the States that have actually considered, discussed, and passed laws setting a minimum age for life without parole have all set that minimum age above 15. That's my primary argument. Thirteen States have done it, all of them except for one, have set it at 18. Alito Do you think there's a difference between a State that says expressly a juvenile below a certain age may be sentenced to life imprisonment without parole, and a State that says that if a person is convicted of capital murder, that sentence may be imposed, and in another sentence, in another provision, says that juveniles may be transferred for prosecution as adults? There's a difference between those two? There is. And that's because the transfer question, which is what informs whether children can be subject to these sentences or not, is a very different question. It's a question about whether the juvenile system that may mandate release at age 18 or age 21 is adequate for an offender. It's not a judgment that that child should therefore be subject to life imprisonment without parole. And so you have this disconnect. You have transfer judgments, which this Court recognized in Thompson and in Graham were not proxies for sentencing judgments. And because of that, it is a very different calculation. The second point is that if there is no minimum age for trying children as adults or even prosecuting children as adults, I think we have to concede that there is an age at which a life without parole sentence would be constitutionally impermissible for any crime. And to the extent that the State hasn't addressed that, which they clearly haven't, you know, in this cohort of 79 children with life without parole for crimes at 14 and younger, more than half come from States where there is no minimum age for trying children as adults. That means in that State a 10-year-old child would arguably have been contemplated by the legislature to be an appropriate person for life without parole, or an 8-year-old child and a 6-year-old child. And I think that asks too much of the statute. Sotomayor, there is no question that you are dealing with a much smaller universe of children sentenced to life without parole who are 14 and under. There is an argument that that's because so few of them commit the crimes. But putting that aside, the universe is rather small. Yes, Your Honor. All right. There is a much, much larger group, as Justice Kennedy pointed out, for life without Go back to my question. Yes, yes. I need an answer to it, which is assuming the bifurcated theory that you proffered, tell me how we get around Harmoland. How would you write that decision? Well, I think that first of all, what this Court has relied on when it's looked at these numbers, what it's been trying to figure out are these objective indicia of society's standards. It's Moore. It's its decency meter, if you will. And we've looked at these numbers to inform us, are these sentences that are consistent with evolving standards of decency, are they now beyond a maturing society? And we've always found in these data some measures. In the death penalty context, we've looked at that in the Roper area, in the Atkins area, and we've been able to make some judgments. The reason why we could do it in these death penalty cases is that unlike the cases here, the death penalty determination is discretionary. The sentencer is required to consider and evaluate a range of mitigating circumstances and facts, including age, that help us assess whether the determination that death is the appropriate punishment means something and the society is still trying to evolve. Here, that's not true. The majority of these sentences are mandatory. So the number tells us less about what the Constitution requires. If it's a decent society. Kagan. The data on the larger population is not as precise, Justice Kagan, as it is with our younger population, but the majority of States are mandatory States. And the estimates are about that 85 percent of those sentences are mandatory sentences. Certainly the States that have the largest populations, Michigan, Pennsylvania, these States have mandatory regimes. Kagan. So you think it would be true, going up to age 18, that 80 plus percent are imposed in States that have mandatory systems? That's correct. And in fact, the overwhelming majority of those sentences come from a handful of States where there is very little discretion to impose a sentence other than life imprisonment without parole. And because of that feature, I don't think, Justice Sotomayor, that the reliance on the number is quite as powerful here as it has been in the death penalty context, where that number represented a very communal judgment with a lot of factors. Sotomayor, it wasn't a majority in theory in Harmland, but at least three justices spoke about a gross disproportionality. Is it your views that a mandatory life without parole for someone like a juvenile is grossly disproportionate? It is, for the very reasons that the Court articulates in both Roper and Graham. We're not arguing that life without parole is disproportionate to the crime of aggravated murder. We are arguing that the status of children, with all of the deficits that childhood status creates, makes that kind of judgment cruel. If we can focus on the mandatory aspect of the case, I know you'd prefer a more general rule. It may be that we have to have your general rule. I'm not sure. If I'm the trial judge and I have to determine whether or not I'm going to give life without parole and it's discretionary, what do I look at? Can I get social scientists to come in and tell me what the chances of rehabilitation are? Are there statistics? Now, we have some quite compelling stories of rehabilitation in this case. I don't know if they're isolated. I don't know where they are in the statistical universe of how often rehabilitation is demonstrated and is real. What do I look at? What's the judge supposed to do? Well, I think one of the problems, Your Honor, with trying to make these judgments is that even psychologists say that we can't make good long-term judgments about the rehabilitation and transitory character of these young people. That's the reason why in Graham this Court didn't permit that kind of discretion. We know that they can't do that. I thought that modern penology has abandoned that rehabilitation thing and they no longer call prisons reformatories or whatever. And punishment is the criterion now, deserved punishment for crime. Now, if that's the criterion, is everything that you say irrelevant? Let's assume I don't believe in rehabilitation, as I think sentencing authorities nowadays do not, both at the Federal and the State levels. It's been made clear. Well, no, I think it would still be relevant, Justice Scalia, but I also don't think that correctional facilities have identified themselves as having no role to play in the rehabilitative process. I mean, one of the problems with this sentence of life imprisonment without parole is that it actually bans and shields this population from a whole range of services that are specifically designed to rehabilitate. Education services, treatment services, anger management programs, all of these programs exist within prisons, including the Federal prisons, because we do care how people perform when they are released. And so corrections is still very much the heart and soul of what we do. But even if it wasn't, punishment nonetheless has to be proportionate and recognize that it can be excessive. And what this Court has said is that when you're looking at children, to equate the failings of a child and an adult would be cruel. It would be unfair to — given our knowledge and understanding of what developmental science has taught us and what we know about kids.  Kennedy. Well, again, it seems you're just forcing us into a bipolar position. We're either going to say that you can't prevail at all or that everyone under 18 cannot get life without parole. I don't see this middle course, which you seem to have abandoned and you can't tell me how a judge would apply it if we chose not to abandon it. Well, I don't intend to abandon it, Justice Kennedy. I mean, obviously, I'm arguing for this categorical ban, but I think the Court could obviously do something else. We think that there is a basis for concluding unquestionably that a child under the age of 15 should not be exposed to life without parole based on this Court's precedents and on the data that's presented. The Court could set a categorical line there and at the same time make a determination that subjecting any child under the age of 18 to life without parole where there is no with what this Court has now constitutionally recognized in both Roper and Grant. Mr. Stevenson, may I ask you a case question specifically about the Miller case? There were two boys involved in this horrendous crime. The older one took a plea and got life with parole. Was a plea offered to Miller? No plea was offered to Miller. What tends to happen, and there was some evidence of this that was developed earlier, is that the question was who was going to give a statement first, who was the most cooperative, whose lawyer is most effective at accomplishing that. There were some complaints. There's a post-conviction pending now that makes some allegations about what the lawyer didn't do to facilitate a plea, but no, there was no offer of life with parole made to Evan Miller. And one of the difficulties, of course, in these cases is that, you know, the younger you are, the more vulnerable you are, the less experienced you are, the less capable you are of managing these dynamics in the criminal justice system that sometimes can be very outcome determinative. Any idea how many juveniles subject to a sentence of life without parole do plead to a lesser sentence? Well, no. It's very hard to determine, mostly because States don't keep data on the age of the person. Roberts Is there any reason, just I realize it's speculation, but wouldn't you think prosecutors would view that as a particularly attractive offer to someone who's young, in the sense that they may regard the sentences extraordinary themselves, that it may be particularly attractive to someone who's young, in a way that it wouldn't be a 40-year-old an offer of 25 years may not be as attractive as it is to a 15-year-old? Well, they might. And I would concede, Your Honor, that this population is kind of less equipped to make determinations about whether to take a plea or whether to not take a plea than an adult. It might be also a basis for, to question the statistics you put forward about how often the sentence is actually imposed. In other words, the evolving standards of decency, you suggest, the prosecutors in the State may not be immune to that evolution, either. They may not be, Your Honor, but we haven't found sort of, at least in this population, any evidence that they are capable of protecting children who we believe, at least, should be protected. And one of the interesting things, at least looking at this cohort of 79, a great number of them have older co-defendants. Both of the kids in the cases before the Court today have older co-defendants who got sentences that were less than life without parole. In the Control Jackson case. Roberts, those statistics aren't very helpful, because we have no idea in the particular cases as to whether or not perhaps the older offender was less guilty than the 16, 17, 15-year-old. That's right, although in some of these cases, actually, when you read the opinions, you do see the evidence of the shooter not getting the life without parole sentence and the accompanies getting it. And I guess my point would be is that, yes, it did. Yes, it did. And my point would be that it just this younger population is going to be disadvantaged in managing this aspect of the process that I think is quite important when the Court is trying to consider whether there should be a categorical ban or something less than a categorical ban. And, Justice Kennedy, I don't mean to suggest that the Court cannot, consistent with its precedents, make a categorical ban under 17. But I also don't mean to suggest that if the Court can't do that, that there aren't ways of reconciling the precedents, drawing a line at 15 and striking down mandatory life without parole. I would urge, for the reasons that we've stated, that in these circumstances, it's better to have a sentence where you can make a judgment about rehabilitation and public safety later in life. We're not arguing that the State has to give away the authority to incarcerate someone even for the rest of their life, life without parole, which is available in this State, Alabama, which facilitate that, but create the meaningful possibility of release that this Court has ordered to be constitutionally necessary in Graham v. Florida. I see my white light is on. I'll reserve the rest of my time. Roberts. Roberts. Thank you, Mr. Stevenson. Mr. Niemann. Thank you, Mr. Chief Justice, and may it please the Court. Imposing life without parole sentences on aggravated murder offenders like Evan Miller is in line with the national consensus, is morally justified, and is consistent with legitimate penological goals. I'd like to touch on all three of those points at some juncture today if I can, but I'd like to start, if I can, with the conversation Mr. Stevenson was having with a few of the justices about the national consensus issue in this case, and more particularly, what we can infer about the judgment of legislatures and ultimately the people based on the statutes we have in this case and the very different set of circumstances we're looking at here than the circumstances the Court was looking at in Graham. Exhibit A on that front is the fact that out of the 39 States or jurisdictions that allow this sentence, as Mr. Stevenson has indicated, or Mr. Stevenson has indicated, a good chunk of them, 27 in all, make the sentence the minimum sentence under the statute. That's an important fact, both because it tells us a little bit about the retributive goals that the legislatures were trying to achieve through these statutes, but it's also the minimum sentence for anyone who commits an aggravated murder, or at least certain kinds of aggravated murders, in 27 of those jurisdictions. Kennedy, that's correct. And effectively, the message that the legislatures are sending is that with respect to aggravated murders, the worst of the worst kinds of murders, there are effectively two sentences. There's either the death penalty, or if there's some sort of mitigating circumstance, the person is at least going to serve life without parole. Breyer, of the numbers, 79 to 82, I guess there's some disagreement whether it's 82 or 79. Regardless, in your opinion, or maybe it's in the briefs, I just can't remember it. Of those, say, 79, how many are there for reasons of mandatory sentence where they would not, no one could consider the individualized nature of the crime or the criminal? We don't have precise statistics, Your Honor. I should say I can't vouch to the statistics on that. That's all right. What's your estimate? My answer is I don't know, in terms of how many are mandatory and how many are not. Well, how many come from the States that have this mandatory system? That shouldn't be too hard to find out. Well, overall, Mr. Stevenson cited about 8 who were sentenced pursuant to nonmandatory schemes of the 78. Nonmandatory. Correct. So you think it's almost, it's probably 90 percent. According to Mr. Stevenson's statistics, it's about 90 percent of the cohort that comes from mandatory. And that's 90, oh, I'd say it's about 70 or 71, and I remember reading a statistic somewhere where they managed to count up the number of possibilities, i.e., serious murders committed by those under 15 over 50 years or some long number of years, and it was somewhere in the 70,000s, was it, or 20,000s, what was it? Your Honor, the statistics I have seen that Mr. Stevenson cited in his reply brief had 7,500 as the number of arrests of persons under the age of 15 for committing homicide or nonnegligent manslaughter. That sounds more reasonable. It's about 1 percent. 1 percent. If I carry that number around in my mind, that 1 percent of those who might have obtained this terrible penalty, 1 percent are actually given it. Your Honor, as Graham indicated, that denominator is crucial, but the 7,500 number cannot be the appropriate denominator for determining whether actual sentencing practices indicate a national consensus against this practice. The reason why is because that 7,500 number is not the number of convictions. It's not the number of opportunities that judges have had to impose this sentence. It is the number of arrests, and it's the number of arrests over the course of 40 years in every jurisdiction, including those that don't impose life without parole at all. Sotomayor, it's not even for homicide offenses that would qualify for life imprisonment without parole for an adult. It's for any nonnegligent homicide, isn't that right? That's correct, Justice Alito. And the real denominator here, the one the Court ought to look at when it considers the role that actual sentencing practices play in the analysis, ought to be the number of aggravated murder convictions. That's not what we're looking at. But what is the justification you're going to get to this, I guess? I want to be sure you do at some point. And I'm not certain it's a cruel and unusual punishment argument. It may be more of a due process argument. But I want to know the justification, giving all those statistics that you've seen and that was in Roper and so forth. Procedurally speaking, what is the justification for not giving the defendant any opportunity to point to mitigating features in his lack of development, in his age, in his upbringing, et cetera? That, to me, is a difficult question. But before we get to that topic, I don't want to. Sotomayor, Actually, I do want to ask, and it dovetails with what Justice Breyer is asking, the Edmund Tyson line for adults, which is we can't execute someone who hasn't killed, intended to kill, or was reckless in killing. This is a question more in the Jackson case, because I think it's an issue there. But although all murder is heinous and regrettable, there are different kinds of murder. That's why some people are subject to the death penalty and others are not. And I do see a world of difference between the Miller killing and the Jackson killing vis-a-vis the individual defendant's personal liability. So assuming there are different kinds of killings, of murder, should we be looking at the Edmund Tyson line at all? Should we be talking about its application to juveniles in a different way? Edmund Tyson basically okayed felony murder if you know that there's a gun involved. But should that line be the same for juveniles? And if so, then how do you go back to justifying, as Justice Breyer spoke about, the mandatory nature of life imprisonment without parole, given that not every juvenile is equal and not every murder is equal with respect to them? Justice Sotomayor, the clearest line the Court could draw on this front would be the line that the Court initially set out in Graham as between homicide and non-homicide offenses. Perhaps there would be some question about whether an Inman-type felony murder counts as a homicide offense or not. But my suggestion is that it would, at least if the Court's looking for a clear line that wouldn't undermine too much of what the Court set out in Graham in terms of clearly distinguishing between homicide and non-homicide offenders. Nonetheless, I certainly agree that there are fundamental differences between certain kinds of murders, and I think that judgment is reflected in the legislation we have in at least 27 of these States where aggravated murder, in the very least, carries with it a life without parole sentence for any defendant, regardless of the mitigating circumstances. Sotomayor, that's not an individual legislative determination. That's just a state. It is a legislative determination that aggravated murder as a class of offenses is so contrary to society's values and so contrary to the dignity that we assume that every victim ought to be afforded, that life without parole is the appropriate sentence. So I think there is an inference to be made there about the legislative judgment, particularly because the sentence is a minimum one. The three-justice concurrence you mentioned, Justice Sotomayor, from Harmelin, makes this point quite vividly. In Solem v. Helm, the Court had struck down a sentence under the gross disproportionality analysis, and the Harmelin concurrence indicated that the Court was a little more comfortable doing that because the sentence in that case was above the minimum and thus did not reflect the judgment of the legislature. But when we are talking about the minimum sentence, it's fair to infer that that's the sentence that the legislature thought as a class in terms of the class of offenses that would be the minimum appropriate sentence for that particular crime. Now, Justice Breyer. Roberts. Roberts. Roberts. It's a little confusing to me, but when you refer to minimum, I assume that was because the statutes prior to Graham had death as one of the other options, that that is no longer an option. So it's a little awkward to refer to it as minimum when it's also the maximum. That's correct, Mr. Chief Justice. When you have an individual is prosecuted for an aggravated murder that carries this sentence, is it typical to also charge lesser-included offenses? Yes, Mr. Chief Justice, and. And in general, what is the distinction between exposure to the maximum crime and a lesser-included crime? In other words, what is the difference between aggravated murder, manslaughter? It typically turns on the state of mind, doesn't it? That's correct, Mr. Chief Justice. So is there any reason to think that juries in a case where they have the option for lesser-included offenses might be concerned in light of the age of the defendant about whether or not the requisite intent was formed? It seems to me that some of the issues that we've suggested justify different treatment of juveniles have to do with mental development, and those same issues would be taken into account by a jury in considering which of a list of offenses the juvenile should be convicted of. Mr. Chief Justice, it's certainly within the realm of reason and possibility for. Was it a factor in Miller's case? Was there a lesser offense that was charged? Yes, Justice Ginsburg, there were lesser-included charges of at least felony murder, which has a very different intent type element to it. But Miller, at least with respect to the charge on capital murder committed in the course of arson, which is an intentional murder, was found guilty by the jury on that charge. It was also a felony murder charge in the Miller case? Yes, Justice Ginsburg. There were two felony murder charges, one as to the robbery in the case and one as to the arson in the case. So it may not be realistic to speak of mandatory life without parole. It's only mandatory if the youth is convicted of the highest charge brought. But it remains within the power of the jury, in light of the youth, to convict him of a lesser offense, which would not produce mandatory life imprisonment without parole. I suppose that's so, Justice Scalia. Are juries instructed that life without parole is a necessary consequence of their decision? I suppose a defense attorney could argue it. Justice Kennedy, actually, I think you're right to the extent you're suggesting that juries probably don't or aren't actually instructed on that point. And the fact would probably be a reversible error, I suppose, for a jury to be instructed on that point. Nonetheless, the judgment that legislatures have reached in terms of setting life without parole as the floor for any murderer is one that was reasonable  Kagan. Kagan. Kagan. Kagan. I'm wondering if we can go back to the issue that Justice Breyer left on the table. And this doesn't have much to do with how many States do what. But instead, just to say that in the death penalty context, we've insisted on individualized sentencing. And in Graham, of course, we equated juveniles who were sentenced to life without parole to people who to adults who were sentenced to death and said that those two should be treated equivalently. And I'm wondering whether that doesn't suggest that the rules we have in the death penalty context about individualized sentencing ought to apply to juveniles who are sentenced to life without parole. Regardless of, like, how many States do what and how many times this happened. But just, you know, two facts. We've insisted on this in the death penalty context, and we've equated the death penalty context to juveniles without life parole in Graham. Justice Kagan, the answer on that front, I think, is that Harmelin effectively sets a bright line here, such that individualized sentencing is only required in a death penalty case. And if it does so. Kagan, but, of course, Harmelin is pre-Graham, and in Graham we equated these two things, adults sentenced to death and juveniles sentenced to life without parole. Well, the reason why Harmelin drew that line, and I guess more to the point, the reason why Woodson v. North Carolina and Lockett v. Ohio held that individualized sentencing was required in the death penalty context was not because the sentence happened to be the highest sentence that someone could receive, but because the sentence was death. And there were certain cases where it was the highest sentence that someone could  And that's the reason why Harmelin drew that line. And in Graham, didn't the Court reject the idea of individualized sentencing in which youth would be taken into account on a case-by-case basis? That's correct, Justice Alito. The States were here jumping up and down asking for that precise result, and we did not get it. And the reason why, the result the Court thought was appropriate was rather than The juvenile would be able to say, I'm a juvenile, and that means that I don't get the highest sentence I otherwise would get. I win the sentencing phase as a matter of law. But the fact that we said that individualized sentencing was not enough in one context does not suggest that individualized sentencing ought not to be the rule in a different context where there is no categorical bar. Justice Kagan, the response on that front, I think, is that the rule from Woodson and Lockett requiring individualized sentencing was one that's specifically tailored to the unique aspects of the death penalty, aspects that remain unique, notwithstanding Graham and the rule it imposed with respect to juveniles. But also, Woodson and Lockett, although I realize that the premise of your question is that we should not look at what other States are doing, the premise of Woodson and Lockett was that States had widely rejected mandatory death penalty sentencing. And we know from the legislative record here that States have done quite the contrary when it comes to mandatory life without parole. Breyer, I understand there are arguments on both sides. I think I've pretty much got the arguments on the question of the individualized sentencing. You can make an argument that it should be individualized life without parole up to age 18, say, 7 through 17, and there's an argument the other way in which you're making it. Okay. What I want to know is your argument the opposite way on this one. What's the minimum age, in your opinion, or is there any constitutional minimum at all in respect to which you could give for a murder a child, life without  I mean, you could have, in instance, a 10-year-old or an 8-year-old. I mean, is it totally up to the States, or is there a minimum? And if there is a minimum, what is it, in your opinion? Yes, Justice Breyer, I think there is a minimum. Now, I would be hesitant to commit to a minimum without further factual development. Well, do your best. Do your best. Do you want to say 12, do you want to say 10, do you want to say 9? Because as soon as whatever you say, I'm going to say, and why not 14? Okay. Well, I will say I would argue, if I were the State up here trying to defend a 12-year-old sentence, I would argue that that was the line. So 12, well, no, well, yes, someone who is 12 years old, someone who is 12 years old, no, we don't care. So now put yourself in my position, because my position. Scalia, you know, I was beginning to agree with you about this case, because I thought you were appealing to what the American people think about the line, or maybe to the common law. Now, the common law had a rule of the age of reason, I think, below 12, you couldn't at least you couldn't impose the death penalty, maybe you couldn't even convict for a felony. Would you just pluck some number out of the air? Why can't I pluck a number out of the air if you pluck one out of the air? Justice Scalia, I was about to give Justice Breyer the arguments that I would make if I were the State in those circumstances about why that's the line. Reason number one, national consensus. If we look to objective indicia, as all of the cases in this line have, what is the indication of a societal consensus that this is okay? Wouldn't it be 14? How many States allow it for a 13-year-old or a 12-year-old? The number of States that allow it for a 12-year-old are somewhere around, well, I suppose that number is close to 10 or so. So that's one reason why I would draw the line around 12 or so. If you look at, for example, the tables. So the 10 States would allow it for a 12-year-old. How many would allow it for a 13-year-old? Do you happen to know? At that point, we're getting up to much more substantial numbers. I guess when we get up to 14, we're up to somewhere in the realm of 30. Ginsburg. Is it taken into account when the child is in the juvenile system initially, has to be moved to the adult system? Is the judgment, is there any cutoff on the transfer, or is it, is there any cutoff on the transfer? Can a child be transferred to the adult system at any age? Well, that I think is the appropriate line in terms of thinking about what the minimum is here. The answer depends on the jurisdiction. In Alabama, 14 is the minimum, but that number is, compared to a lot of other jurisdictions, a little high. So if you're under 14, you can't be transferred out of the juvenile system? That's correct. In Alabama, if you're under 14, you can't be transferred out. Now, many other States, at age 13, you can be transferred in, or you can be transferred into the adult system, which is why there are a few 13-year-olds who are presented. But 13, he would get out when? When he's 21? In Alabama, the juvenile justice system's jurisdiction terminates at 21, yes. That's why he's arguing that the legislatures don't focus on it. If you do a public opinion poll or just ask me, for example, or ask anyone, you say the question is, should at what age should juveniles be able to be transferred out of the juvenile system into the adult system, you might get one answer, maybe 14, maybe 15, maybe 12. But if you put the question, at what age should they be receiving a mandatory life without parole, the answer might be different. And his point is they never ask that question. They ask the first question, not the second. And that disturbs me enough to think that I can't think the answer to this question that I asked you just relies on public opinion polls or even just the number of States. I'm not sure about it. But that's why I want to hear your response, because it sounds like we're arguing between whether it should be 13, 12, or 14 in terms of an absolute cutoff. So how do I approach that? I'm asking you for help on that one. I know you have a side in this. But I say, well, we're talking about 14 and we have all this scientific literature and so forth. Justice Breyer, the reason why it's fair to infer that legislatures would have concluded that a 14-year-old, for example, in Alabama would be subject to a mandatory life without parole sentence is precisely because it's mandatory. Surely the legislatures understood that when they were transferring persons who committed crimes like aggravated murder that were well within the heartland of the crimes for which the transfer statutes were intended, those offenders would be subject to the minimum sentences at least. It's quite another thing to say, well, the legislature might have enacted a statute providing for transfer for a 14-year-old and for a non-homicide crime, they might have assumed that the person would get less than the maximum in terms of life without parole. But surely the legislatures understood that those offenders would at least get the minimum. And the reason why the line is more safely drawn at 13 or 12 is because if you look at, for example, the tables from the Department of Justice reports that both sides and the amici have cited listing the transfer ages, by and large, the number seems to cut off at 12 or so. And 12 would be on the very bottom end of the range, and if I were a defense attorney, I'd be arguing much harder for a line at 13 than 12. I imagine if I were a defense attorney, I'd be arguing for an even higher line than that. But the point is that if we're going to judge this in terms of objective indicia of what society has decided, that seems to be the line that society has drawn. That line is. Kennedy, in the Petitioner's briefs, the idea of deterrence kind of drops by the wayside. Have there been any studies that show that there is a deterrence value? I remember in Roper, there was actually discussion among the young people before they committed the crime as to whether or not they could get the penalty. It was actually right there in the record. Does the State rely on the deterrence component of the punishment here? Justice Kennedy, we think that deterrence is in the mix, but it's certainly not the primary goal that these statutes serve. Is it retribution? Retribution, Justice Kennedy, would be the primary goal, bringing society's retributive force to bear on those who commit the worst sorts of crimes. But retribution, of course, is related to personal culpability. We said that in Tyson's, and that loops back into the minor problem. That's exactly right, Justice Kennedy. But I think one point on which Mr. Miller and the State fundamentally disagree here is what we can conclude about a juvenile's culpability when the juvenile has committed aggravated murder. The reason why Graham came out as it did, the reason why life without parole was not The Court there said that meant that Graham's culpability was twice diminished, once because he was a juvenile and once because he had not committed murder. Well, here we have the hypothetical from Graham where the one level of diminishment is gone, and Miller has — Miller is entitled to a one-level diminishment because of his juvenile status, but he's not entitled to that second level of diminishment, which is what he's seeking here. Kennedy, are you aware of any statistics that give us some quantitative sense as to how many juveniles, after years and years of prison, show significant rehabilitation? Do we know anything about that? Justice Kennedy, I know of no statistics on that particular front. I imagine that some vignettes could be told about success stories and some vignettes could be told about stories that were not success stories. Do you have any reason to think that juveniles are any better than anyone else as far as learning from prison is concerned? I mean, recidivism is a big problem, isn't it? People who have been to prison go out and commit the same crimes again, don't they? That's exactly right, Justice Scalia. Is there any reason to think that juveniles are any different? Justice Scalia, I haven't seen any studies that would suggest that juveniles do better, particularly when they are subjected to the sorts of crimes that I think everyone would have — or the sorts of offenses, let me say, that I think everyone would agree the Constitution would have to permit, a sentence of, say, 40 years minimum or the like. So I just don't — I think society — society's primary goal here or the government's primary goal here is expressing the retributive judgment about the wrongfulness of murder and why it's different from non-homicide. But I think governments are quite legitimate and quite reasonable when they also say that they don't want to roll the dice on convicted murderers. Society acts with particular revulsion when a convicted murderer commits a crime again, and even if that difference in terms of recidivism is no different, or even if the possibility for recidivism is no different, the fact that the person committed a murder once and might commit a murder again is reason enough for legislatures to be hesitant to allow for parole in these circumstances. With respect to the penological purposes, there's also an important purpose here with respect to the unique factors and the unique circumstances that murder victims and their families face. I think a lot of people hear about life without parole sentences, and if they pose them on political grounds or policy-based grounds, one of their sort of pragmatic responses is, well, what's the cost to all this? Why not just let these guys get their parole hearings, give them that hope, and likely they won't get parole anyway? And there's really no cost to society, at least in allowing that process to occur. But the cost is to the victims and their families, who have to endure what are often very painful hearings and parole hearings, and when those come up on a frequent basis, that sort of re-traumatization process is something that governments can legitimately take into account when they decide that for aggravated murder, and not for other crimes, but for aggravated murder, life without parole sentence is an appropriate sentence. On the moral culpability point, there would be some anomalies created by the rule that Miller is seeking here. Miller is asking the Court to effectively hold him in the same place in terms of his moral culpability as the defendant in Graham. In other words, Graham can only get life with parole because of his reduced moral culpability, and Miller is saying he should only get life with parole because of his reduced culpability. So that would mean one of two things. Either the Eighth Amendment would put a murderer on the same moral level as someone who committed a non-homicide crime, as in Graham, or Graham himself would be back in this Court or a court of another jurisdiction arguing that because Graham held that Graham himself had categorically less culpability than someone like Miller, then Graham himself is entitled to a lesser punishment than the one that Miller in fact received. Kaganen I mean, if you look at those two cases and you look at the individuals, the child's actions in the two cases, they really are remarkably similar. They're sort of, of a piece. Don't you agree? I mean, how is it that the child's actions in this case were any different from that in Graham? Kaganen Justice Kagan, I think that Miller's actions were dramatically different from Graham's actions, in part because Miller intended to kill this victim and killed the victim in a rather gruesome way. So there's not an element of luck here in terms of the fact that, oh, well, Graham was simply lucky that he didn't, Camille, that he didn't. Ginsburg And that's in the Jackson case. In the Jackson case, the crime was very similar, too. Kaganen I'm sorry. Justice Ginsburg is of course right. Well, I defer to my colleague from Arkansas in terms of the distinctions between Jackson and Graham. But certainly with respect to Miller's crime, his moral culpability is greater and the law should recognize that. Kennedy If the judge were to determine under a rule that the sentence can't be mandatory whether or not life should be imposed, what would be the sorts of factors that he would look at, or do you think that those are just too ineffable, too imprecise to be considered? Kaganen Well, Justice Kennedy, I think it certainly would be possible to have a regime under which a judge considered mitigating circumstances in a case like this. Many jurisdictions have reasonably opted for that route rather than the one that Alabama and 26 other jurisdictions have. Kennedy Are there standard sorts of mitigating circumstances that we see in capital cases, you think? Kaganen Absolutely. I think that's exactly what would happen. You would have arguments about certain murders being worse than others, and Mr. Miller would have an opportunity to argue about other mitigating circumstances relating to his background and the like, as he's argued in his reply brief here. But at the same time, it's reasonable for legislatures to conclude that they're going to draw a line in the sand with respect to aggravated murder such that as a floor in terms of the appropriate punishment, the defendant is going to get, at the very least, life without parole, a punishment that's no doubt severe, but one that is less severe than the impact the crime has had on society. And for those reasons, we'd ask the Court to affirm. Roberts. Thank you, Mr. Nieman. Mr. Stevenson, you have four minutes remaining. Stevenson Thank you, Mr. Chief Justice. I just want to make clear that the rule we seek would not require States to impose the same sentence on juveniles convicted of homicides and juveniles convicted of non-homicides. The States would be free to do that if they chose to, but they could certainly create a regime where it's life with parole, where there are different ages for eligibility. In fact, the State of Nevada makes you eligible for parole after 15 years if the crime is a non-homicide, 20 years if it's a homicide. The States would still have a great deal of flexibility to create, consistent with this Court's rule, a regime that makes these distinctions. Justice Kennedy, I did want to point, direct your attention to two amicus briefs that I think respond to two of the questions you've raised. There is an amicus brief submitted by criminologists in this case that looks specifically at the question of deterrence. And what they found is that life without parole has not had any measurable deterrent effect. The States that don't put juveniles, don't subject children to life without parole have actually experienced the same level of decrease in violent crime and homicide as the States that do. And, in fact, in some of those jurisdictions, the decrease is even more significant. I also want to address your question, Justice Scalia. There is, there are some studies that have established that juveniles are more likely or less likely to recidivate after an intervention than adults. Generally speaking, homicide offenders are categorically less likely to recidivate than many non-homicide offenders. Drug offenders and property crime offenders are much more likely to recidivate than homicide offenders. And so there's a lot to support that a judgment rooted in these penological concerns would be well supported here. I also want to return, Justice Breyer, to your question. Mr. Dymond has argued that we can read into these statutes a commitment to imposing life without parole at a particular age, and that age is the age of transfer. I just want to highlight that the two States with the largest populations of juveniles serving life without parole, by a huge margin, are Pennsylvania and Michigan, neither of which has a minimum age. That means in those States a child of any age can be subject to a mandatory sentence of life without parole. It's simply not true that we can read into those statutes and those jurisdictions any kind of conscious commitment to thinking about age. The other point I want to make is that Scaliar You think the legislators in Pennsylvania and Michigan don't understand what their laws provide? Dymond I think that they haven't thought about it. Yes, I do think that. I mean, for example, this goes to the next point I was about to make. My colleague keeps talking about aggravated murder. In the State of Pennsylvania, it's not just aggravated murder that subjects you to a mandatory life without parole. If you're convicted of second-degree murder, no intent, diminished, it's still mandatory life without parole. We have 14-year-old children, and again, that's the largest cohort in our group, in the State of Pennsylvania convicted of clearly unintentional killings that have been subject to mandatory life without parole. South Dakota does the same thing. I think where there is no minimum age and where you have that kind of regime, I cannot I don't think we can conclude that they've thought about Roberts What if they do? I mean, what if after our decision or even after the argument, States go back and say, look, the decision is based on the fact that they don't think we know our law, that we haven't thought about it, so let's have a hearing about it, and then we vote that, yes, there should be or no, there should not be a minimum age. We think at 16, whatever age they do. Then does the constitutional rule change? Once we get 30 States saying, look, we've thought about it and this is our answer, then whether the Eighth Amendment prohibits it or not changes? No. I don't think it changes, because there is an age at which this Court is obligated under the Eighth Amendment to say a sentence of this sort, a permanent judgment, that lifelong incarceration is required. Well, right, but one of the things we take into account is societal consensus. And you say we should ignore the 30 whatever-it-is States that allow this, because they didn't really think about it. So I'm postulating, well, let's make, let's see if they have thought about it. Yeah. Well, in that regard, Mr. Chief Justice, I think that we do have 13 States that have thought about it. That have expressly looked at this question of what the minimum age should be. And in 12 of those 13 States, they have set the age above 14. Most of those States have set the age at 18. So if that's the Court's lens, then I think that would support the kind of rule that we're seeking here. Scalia What if, instead of striking down the laws in these States, why don't we just require the State legislatures to think about it, all right, and then see how many think about it and come up with, you know, something that agrees with you or doesn't agree with you? Well, I think it's in part Couldn't that be more democratic somehow? It might be more democratic, but I don't think it would be consistent with the constitutional obligation that this Court has to protect people who are vulnerable from excessive punishment. And this is a cohort that we contend is the most vulnerable and should be shielded from this excessive punishment. Thank you, Mr. Stevenson. Mr. Niemann, the case is submitted.